**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**ANGELA D. ALLEN,**

       **Plaintiff,**

**v.**                              **Case No.: 2:15-cv-04162**

**CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,**

       **Defendant.**

**<ins>PROPOSED FINDINGS AND RECOMMENDATIONS</ins>**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable John T. Copenhaver, Jr., United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 10 & 11).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's request for judgment on the pleadings be **DENIED**; that the Commissioner's request for judgment on the pleadings be **GRANTED**; that the decision of the Commissioner be **AFFIRMED**;

and that this case be **DISMISSED**, **with prejudice,** and removed from the docket of the Court.

## I.   <u>Procedural History</u>

On September 22, 2011, Plaintiff Angela D. Allen ("Claimant") filed an application for DIB, alleging a disability onset date of September 7, 2011, due to "anxiety, back injury, neck injury, knee problems, hip problems, [and] carpal tunnel [syndrome]." (Tr. at 138, 185). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 69-79, 81-87). Claimant filed a request for an administrative hearing, (Tr. at 88), which was held on October 30, 2013 before the Honorable Jack Penca, Administrative Law Judge ("ALJ"). (Tr. at 29-64). By written decision dated November 20, 2013, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 11-23). The ALJ's decision became the final decision of the Commissioner on February 10, 2015, when the Appeals Council denied Claimant's request for review. (Tr. at 1-4).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 8 & 9). Claimant then filed a Brief in Support of Judgment on the Pleadings, (ECF No. 10), and the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 11), to which Claimant filed a response, (ECF No. 12). Consequently, the matter is fully briefed and ready for resolution.

## II.   <u>Claimant's Background</u>

Claimant was 44 years old at the time she filed the instant application for benefits, and 46 years old on the date of the ALJ's decision. (Tr. at 23, 138). She is a high school graduate with some college education and communicates in English. (Tr. at 36, 184, 186).

Claimant previously worked as a night club manager and an order preparation packer. (Tr. at 186, 195).

### III.   <u>Summary of the ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the

3

performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2016. (Tr. at 13, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since September 7, 2011, the alleged disability onset date. (Tr. at 13, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "carpal tunnel syndrome and degenerative disc disease." (Tr. at 13, Finding No. 3). The ALJ also considered Claimant's alleged impairments of knee problems, migraine headaches, Attention Deficit Hyperactivity Disorder ("ADHD"), major depressive disorder, and anxiety. (Tr. at 14-15). However, he determined that Claimant's knee problems, ADHD, major depressive disorder, and anxiety were non-severe, and her migraine headaches were not medically corroborated. (Tr. at 14).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments

contained in the Listing. (Tr. at 15, Finding No. 4). Accordingly, the ALJ determined that

Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20
> CFR 404.1567(b) except she can only occasionally climb ramps, stairs,
> ladders, ropes and scaffolds. She may occasionally balance, stoop, kneel,
> crouch and crawl; and frequently handle and finger. She must avoid
> concentrated exposure to cold, heat, vibrations and hazards.

(Tr. at 15-21, Finding No. 5). At the fourth step, the ALJ found that Claimant was unable

to perform any past relevant work. (Tr. at 21, Finding No. 6). Under the fifth and final

inquiry, the ALJ reviewed Claimant's past work experience, age, and education in

combination with her RFC to determine her ability to engage in substantial gainful

activity. (Tr. at 21-22, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born

in 1966 and was defined as a younger individual age 18-49; (2) she had at least a high

school education and could communicate in English; and (3) transferability of job skills

was not material to the disability determination because the Medical-Vocational Rules

supported a finding that the Claimant was "not disabled," regardless of her transferable

job skills. (Tr. at 21-22, Finding Nos. 7-9). Given these factors, Claimant's RFC, and the

testimony of a vocational expert, the ALJ concluded that Claimant could perform jobs

that existed in significant numbers in the national economy, including work as a customer

service representative, sales attendant, or ticket taker at the light exertional level. (Tr. at

22, Finding No. 10). Therefore, the ALJ found that Claimant was not disabled as defined

in the Social Security Act. (Tr. at 23, Finding No. 11).

## IV.   Claimant's Challenge to the Commissioner's Decision

Claimant raises a single challenge to the Commissioner's decision. Specifically,

Claimant argues that the ALJ's RFC finding is not supported by substantial evidence for

at least three reasons. (ECF No. 10 at 9-15). First, Claimant asserts that the ALJ failed to

adequately consider the walking and standing limitations caused by her knee impairment. (*Id.* at 12). Claimant contends that the ALJ placed too much weight on evidence that predated the alleged onset of disability when evaluating the severity of her knee disorder. According to Claimant, the ALJ focused exclusively on an MRI taken of Claimant's left knee in October 2009, which showed ganglion cysts, degenerative changes with chondromalacia, spurring, and free edge fibrillation of the meniscus. The ALJ remarked that, notwithstanding the findings reflected on the MRI, Claimant had "retained the capacity to perform substantial gainful activity for approximately two years despite the knee problems." (*Id.*) The ALJ then extrapolated from the old MRI, and without any new findings to support it, reached the flawed conclusion that Claimant's knee impairment had remained non-severe. Moreover, Claimant asserts that the ALJ falsely stated that treatment notes after the alleged onset date did not mention any knee problems, when, in fact, medical records confirmed Claimant's complaints of a torn meniscus, difficulty walking, falls, knee pain, and dysfunction. (*Id.* at 12-13).

Second, Claimant insists that the ALJ did not fully discuss and take into account the medical evidence related to her carpal tunnel syndrome when formulating Claimant's RFC. (*Id.* at 14). Claimant argues that this medical evidence supported additional limitations in her ability to lift, carry, and handle, and that limitations in these areas were critical as to whether Claimant could maintain competitive employment. (*Id.*) Finally, Claimant tersely asserts that the ALJ's RFC discussion neglected to mention a notation by her treating physician, Michael Shramowiat, M.D., in a November 2011 treatment record that Claimant was limited to a sedentary job. (*Id.* at 15).

In response, the Commissioner contends that the ALJ's RFC finding is supported by substantial evidence. With respect to Claimant's knee condition, the Commissioner

argues that the ALJ fully considered Claimant's knee problems and correctly found there was no credible evidence supplied by her medical providers supporting a conclusion that Claimant's knee issues significantly limited her ability to perform basic work activities. (ECF No. 11 at 10). The Commissioner notes that the ALJ's written decision specifically discussed Claimant's testimony concerning her knee problems and Dr. Shramowiat's findings upon physical examination of Claimant's knees. (*Id.* at 11). The Commissioner asserts that the ALJ accounted for the credibly established physical limitations caused by Claimant's knee problems by limiting her to occasional kneeling, crouching, and crawling. (*Id.* at 11). In addition, the Commissioner argues that even if Claimant were more limited with respect to kneeling, crouching, or crawling, at least two of the jobs which the vocational expert testified Claimant could perform do not require any kneeling, crouching, or crawling; consequently, the Commissioner asserts that Claimant cannot demonstrate prejudice from any alleged error. (*Id.* at 12). As to Claimant's carpal tunnel syndrome, the Commissioner contends that the ALJ extensively discussed the medical evidence related to that condition. Specifically, the ALJ discussed Claimant's complaints of numbness, tingling, and pain in her upper extremities, referenced physical examination findings of decreased sensation or strength, and noted that Dr. Shramowiat recorded a positive Tinel's sign and mild shoulder impingement during his appointments with Claimant. (*Id.* at 13-14). Moreover, the ALJ discussed Dr. Shramowiat's findings that Claimant retained 5/5 upper extremity strength as well as grossly intact sensation in her upper extremities. (*Id.* at 12). Accordingly, the Commissioner insists that the ALJ adequately considered Claimant's carpal tunnel syndrome in formulating her RFC. Finally, to the extent that Claimant briefly argues that the ALJ should have discussed Dr. Shramowiat's notation that Claimant was limited to a sedentary job, the Commissioner

7

points out that Dr. Shramowiat subsequently stated in a treatment record that Claimant could potentially return to her past work at a medium-level exertional job, pending the results of a functional capacity evaluation. (*Id.* at 14).

In her reply memorandum, Claimant asserts that the ALJ did not indicate that any limitation with respect to kneeling, crouching, or climbing was related to Claimant's knee impairment. (ECF No. 12 at 2). Moreover, Claimant argues that the ALJ failed to consider the effects of Claimant's knee impairment on her ability to perform the standing or walking requirements necessary for light work. (*Id.*) Claimant again emphasizes the ALJ's inaccurate statement at step two of the sequential process that treatment notes after the alleged onset date did not reference any knee problems. (*Id.* at 3).

## V.    <u>Relevant Medical History</u>

While the undersigned has reviewed all evidence of record, only the medical information most relevant to Claimant's argument is summarized below:

### *A. Treatment Records*

On January 10, 2009, Claimant presented to Health Bridge Imaging for an MRI of her cervical spine due to a history of neck pain and spondylosis, along with right arm and finger pain, numbness, and radiculopathy. (Tr. at 246). Gregory Meyers, M.D., interpreted the MRI as showing moderate degenerative spondylosis at C4-5, C5-6, and C6-7 with disc-spur complexes. (*Id.*) Dr. Meyers also observed moderate acquired central spinal canal stenosis and mild to moderate left foraminal narrowing at C5-6 and C6-7. (*Id.*) No definite neural compression was seen. (*Id.*)

Rammy Gold, M.D., and Melischa Cowdery, Nurse Practitioner ("NP"), of Pars Neurological Associates, Inc., examined Claimant on February 17, 2009 for complaints of neck pain that radiated to her right shoulder and arm. (Tr. at 227). Claimant reported that

the symptoms began immediately after a fall she had in 1993, but they had worsened in the previous three months. (*Id.*) Claimant indicated that she also experienced weak grip, numbness, and tingling in both hands. (*Id.*) She stated that pain medications were very helpful. (*Id.*) Upon examination, a Spurling's test was negative and a Phalen's sign was absent; however, a Tinel's sign was present in both wrists. (Tr. at 229). Claimant's upper and lower extremities were nontender, retained normal range of motion, and exhibited no signs of edema. (Tr. at 230). A motor examination of Claimant's extremities was normal with the exception of decreased strength in Claimant's right upper extremity. (*Id.*) Claimant's gait was normal, and she was able to stand without difficulty as well as ambulate without devices. (*Id.*) Dr. Gold and Ms. Cowdery assessed Claimant with cervicalgia; spondylosis; disc/spur complexes at C4-5, C5-6, and C6-7; spinal stenosis in the cervical region; and mild to moderate cord narrowing and foraminal narrowing at C4-5, C5-6, and C6-7. (Tr. at 231). Claimant's treaters advised her that if injections did not alleviate her symptoms, then surgery may be beneficial. (*Id.*)

Claimant presented to Michael Shramowiat, M.D., on March 26, 2009, with complaints of headaches, neck pain, numbness in both upper extremities, weakness in her right upper extremity, and pain in both shoulders. (Tr. at 353). Upon examination, Dr. Shramowiat recorded that Claimant had a fifty-percent reduction in cervical flexion, extension, side bend, and rotation. (Tr. at 354). Pain was elicited with all cervical ranges of motion. (*Id.*) Claimant's bilateral upper extremity strength was noted to be 5/5, and her sensation was grossly intact and symmetrical to light touch. (*Id.*) Dr. Shramowiat observed that Claimant's deep tendon reflexes were 2+ at the brachioradialis. (*Id.*) Claimant exhibited a strong, positive impingement test in her right shoulder. (*Id.*) She experienced moderate muscle tightness at the cervical paravertebral region, pain at the

greater occipital nerve bilaterally, and pain at the right supraspinatus. (*Id.*) Dr. Shramowiat diagnosed Claimant with right shoulder impingement, cervical radiculopathy, and bilateral greater occipital neuralgia. (*Id.*) Her treatment plan included prescriptions for Robaxin, Naproxen, and Vicodin, and she was advised to apply ice to her neck and shoulders. (*Id.*) Dr. Shramowiat also ordered an EMG of Claimant's upper extremities. (*Id.*)

On April 28, 2009, Dr. Shramowiat performed an EMG and nerve conduction study on Claimant's upper extremities. (Tr. at 368-69). The nerve conduction study showed that Claimant's median motor latency was prolonged bilaterally, but the remainder of the test was normal. (Tr. at 369). The EMG of Claimant's upper extremities was likewise normal. (*Id.*) Dr. Shramowiat assessed Claimant with bilateral carpal tunnel syndrome. (*Id.*) Claimant was instructed to wear hand splints at night time and continue her current medications. (Tr. at 352). Dr. Shramowiat also opined that Claimant did not require neck surgery. (*Id.*)

Claimant followed up with Dr. Shramowiat on June 9, 2009. (Tr. at 351). He noted that she engaged in "a lot of overhead activity." (*Id.*) Upon examination, Claimant's bilateral upper extremity strength measured 5/5, and her sensation was grossly intact and symmetrical to light touch. (*Id.*) Dr. Shramowiat observed that Claimant demonstrated crepitus in her left knee along with moderate to severe swelling. (*Id.*) Claimant also experienced moderate to severe muscle tightness in her cervical paravertebral region and moderate to severe pain in her thoracic paravertebral region. (*Id.*) Dr. Shramowiat injected Claimant's left knee with Methylprednisolone and Lidocaine. (*Id.*) Claimant was advised to continue her medication regimen of Robaxin, Naproxen, and Vicodin.

On August 6, 2009, Claimant returned to Dr. Shramowiat. (Tr. at 350). He noted that a recent x-ray of Claimant's cervical spine revealed some degenerative changes at C4-5, C5-6, and C6-7 with facet changes, anterior spurring, and mild foraminal narrowing bilaterally. (*Id.*) Upon examination, Claimant's bilateral upper extremity strength measured 5/5, and her sensation was grossly intact. (*Id.*) She experienced moderate muscle tightness in the rhomboids and moderate to severe muscle tightness in the cervical paravertebral region. (*Id.*) Dr. Shramowiat increased Claimant's Vicodin dosage. (*Id.*)

On October 13, 2009, Claimant reported to Dr. Shramowiat that she suffered from chronic neck pain that radiated more severely to her right upper extremity and bilateral upper extremity numbness and tingling.[1] (Tr. at 349). Claimant also complained of an increased severity of chronic knee pain. (*Id.*) Claimant indicated that she was very physically active and that she was working seventy to ninety hours each week. (*Id.*) Upon examination, Dr. Shramowiat observed that Claimant had mild crepitus with flexion and extension of both knees as well as generalized left knee tenderness and mild left knee effusion. (*Id.*) Dr. Shramowiat recorded paresthesias in both hands. (*Id.*) Claimant also experienced bilateral shoulder impingement as well as lumbar paraspinal tenderness and tightness. (*Id.*) Dr. Shramowiat continued Claimant on Vicodin and Robaxin, and he also prescribed Ibuprofen 800 mg. (*Id.*)

Claimant presented to Health Bridge Imaging on October 16, 2009 for an MRI of her left knee due to pain and lateral swelling. (Tr. at 365). Gregory Meyers, M.D., found no significant change in Claimant's left knee since her prior MRI taken in 2007. (*Id.*) Dr.

---

[1] Some of Claimant's treatment records from her visits with Dr. Shramowiat are also electronically signed by various physician assistants who worked at the same office. For ease of reference, the undersigned only refers to Dr. Shramowiat even though Claimant may have been seen by a physician's assistant at those appointments as well.

Meyers observed chronic multi-lobulated septated cystic masses in the superior popliteal region and superficial to the lateral knee joint, most likely ganglion cysts. (*Id.*) In addition, Dr. Meyers found medial femoral-tibial compartment degenerative changes with chondromalacia, minimal spurring, and free edge fibrillation of the meniscus. (*Id.*)

Dr. Shramowiat saw Claimant for multiple joint aches and pains on December 8, 2009. (Tr. at 348). Claimant reported persistent neck pain that radiated more to the right shoulder and upper extremity. (*Id.*) She also complained of persistent left knee pain. (*Id.*) Claimant reported that she continued to work seventy to ninety hours each week. (*Id.*) Upon examination, Claimant's cervical spine range of motion was mildly limited and stiff. (*Id.*) Her upper extremity strength was -5/5 bilaterally, and she had weakened grip strength bilaterally; however, Claimant's sensation was intact. (*Id.*) Dr. Shramowiat recorded Claimant's lower extremity strength as 5/5 on the right and 4/5 on the left. (*Id.*) Claimant experienced persistent numbness in the fourth and fifth toes of her feet. (*Id.*) With respect to Claimant's left knee, Dr. Shramowiat noted that Claimant had difficulty with full extension as well as generalized tenderness and swelling on the lateral aspect. (*Id.*) Dr. Shramowiat also observed tenderness at the popliteal area. (*Id.*) Claimant continued to show signs of cervical paraspinal tenderness and mild bilateral shoulder impingement. (*Id.*) Claimant was assessed with cervical spondylosis, cervical radiculopathy, meniscus tear of the left knee, lumbar radiculopathy, and carpal tunnel syndrome. (*Id.*) Dr. Shramowiat recommended an orthopedic referral to consider knee surgery and instructed Claimant to continue her medications. (*Id.*)

Claimant against visited Dr. Shramowiat on February 4, 2010. (Tr. at 347). Claimant continued to complain of upper extremity, neck, and left knee pain. (*Id.*) Upon examination, Claimant's upper extremity strength was 5/5. (*Id.*) She experienced some

paresthesias in the median nerve root distribution bilaterally, and a Phalen's test was positive in both hands. (*Id.*) Claimant's medication regimen remained the same other than the addition of Cymbalta. (*Id.*) Dr. Shramowiat noted Claimant needed to obtain Futuro splints for both hands to be worn at night. (*Id.*)

Claimant treated with Dr. Shramowiat seven additional times in 2010. On April 6, Dr. Shramowiat observed that Claimant's bilateral upper and lower extremity strength was 5/5; however, she experienced some paresthesias in the median nerve distribution and had severe pain at the end range of extension in her left knee. (Tr. at 346). Claimant was continued on Vicodin and provided prescriptions for Xanax and Soma. (*Id.*) On June 3, Dr. Shramowiat noted that Claimant's upper extremity strength was 4/5 on the right and 5/5 on the left. (Tr. at 345). Claimant experienced paresthesias in both hands and had positive Tinel's and Phalen's tests bilaterally. (*Id.*) Claimant was assessed with chondromalacia patella, carpal tunnel syndrome, neck pain, and cervical radiculopathy, and she was prescribed Hydrocodone. (*Id.*) On July 13, Dr. Shramowiat ordered an MRI of Claimant's cervical spine, which was performed on July 19, 2010 at Camden-Clark Memorial Hospital. (Tr. at 344, 360-61). On July 29, Dr. Shramowiat noted that the MRI of Claimant's cervical spine revealed moderate degenerative changes at C4-C6. (Tr. at 343). The MRI also showed mild prominence of the central canal below C6, but no definite syrinx. (*Id.*) Dr. Shramowiat performed an EMG and nerve conduction study of Claimant's upper extremities at the July 29 visit. (Tr. at 343, 357-59). The nerve conduction study showed that Claimant's right median motor latency was prolonged and left median motor latency was borderline normal. (Tr. at 343). Claimant's EMG study was normal. (*Id.*) Dr. Shramowiat assessed Claimant with bilateral carpal tunnel syndrome. (*Id.*)

On August 25, Claimant complained of neck pain, significant left knee pain with occasional swelling, and occasional bilateral numbness in her hands, which caused her to drop things. (Tr. at 341). Claimant exhibited a positive Tinel's sign bilaterally. (*Id.*) She was assessed with bilateral carpal tunnel syndrome; bursitis, trochanteric on the right; low back pain; cervical radiculopathy; lumbar radiculopathy; and osteoarthritis of the knee. (*Id.*) Dr. Shramowiat provided a left knee injection and prescribed Xanax, Soma, Percocet, and Voltaren gel for her left knee. (*Id.*) Claimant declined a referral to a surgeon, and Dr. Shramowiat suggested that she attend physical therapy. (*Id.*) At her October 26 visit, Claimant stated that working long hours had made her neck and knee pain worse. (Tr. at 339). Upon examination, Claimant exhibited decreased sensation in her first three fingers bilaterally and a positive Tinel's sign. (*Id.*) Claimant's lower extremity strength was 5/5 and her patella reflex was +2 on the right side, but Dr. Shramowiat could not test her left side due to pain and significant crepitus. (*Id.*) Neurontin and Naproxen were added to Claimant's medication regimen. (*Id.*) On November 22, Claimant informed Dr. Shramowiat that she continued to experience hand weakness and drop things. (Tr. at 337). Claimant asserted that she did not wish to have surgery at that time because she intended to continue working. (*Id.*) Upon examination, Claimant's upper and lower extremity strength measured 5/5; however, she was unable to fully extend her left knee due to extreme pain and paresthesias was recorded in both hands. (*Id.*)

On January 20, 2011, Claimant continued her treatment with Dr. Shramowiat. (Tr. at 336). Claimant reported neck, low back, and knee pain. (*Id.*) Upon examination, Dr. Shramowiat recorded that Claimant's extremity strength was 5/5 and that her sensation was grossly intact. (*Id.*) Claimant's deep tendon reflexes were 2+ at the patella and Achilles on both sides. (*Id.*) She continued to have some paresthesias in the median nerve

root (upper arm) distribution bilaterally. (*Id.*) Claimant was continued on her medication regimen. (*Id.*)

At Claimant's March 17, 2011 visit with Dr. Shramowiat, she again complained of neck and upper extremity pain as well as some numbness in both hands and feet. (Tr. at 334). Claimant continued to work at that time. (*Id.*) Upon examination, Dr. Shramowiat noted paresthesias in both upper extremities and upper extremity strength of 5/5. (*Id.*) Claimant's left knee exhibited a positive pivot shift and joint line tenderness. (*Id.*) Claimant's Naproxen intake was increased, and she was instructed to follow-up with a surgeon. (*Id.*)

On May 12, 2011, Claimant informed Dr. Shramowiat that she was still working fulltime and that she did not want to have surgery. (Tr. at 333). Claimant reported that her left knee pain increased with prolonged ambulation or climbing stairs. (*Id.*) Claimant's bilateral lower extremity strength was 5/5, her sensation was grossly intact, and her deep tendon reflexes were 2+ at the patella and Achilles. (*Id.*) Her upper extremity strength was 5/5, and some paresthesias at C6 was noted in both upper extremities. (*Id.*) Claimant was diagnosed with bilateral shoulder impingement, cervical radiculopathy, neck pain, low back pain, and osteoarthritis and meniscal tear of the left knee. (*Id.*) Dr. Shramowiat increased Claimant's Neurontin and Soma intake as well as her Percocet dosage. (*Id.*) Claimant was advised to avoid overhead activities and apply ice to her neck, shoulders, left knee, and low back. (*Id.*)

On July 25, 2011, Claimant presented to Health Bridge Imaging for an MRI of her lumbar spine. (Tr. at 248). Craig Platenberg, M.D., interpreted the MRI as showing an anterior T10-11 disc extrusion and osteophyte complex. (*Id.*) He observed no canal or nerve root compromise, and he saw no worrisome osseous lesion. (*Id.*)

15

Claimant returned to Dr. Shramowiat on August 9, 2011. (Tr. at 258). Claimant reported that one month prior to her appointment, she was at work putting boxes on a conveyor belt when one box began to fall, and she tried to catch it, which resulted in Claimant twisting her lower back. (*Id.*) Claimant continued to work after that incident. (*Id.*) Upon examination, Dr. Shramowiat noted that Claimant's bilateral lower extremity strength measured 5/5, and her sensation was grossly intact. (Tr. at 259). Claimant's deep tendon reflexes were 2+ at the patella and Achilles. (*Id.*) A straight leg raise test was positive in Claimant's left lower extremity. (*Id.*) There was moderate to severe muscle tightness along with numerous palpable tender points and trigger points in Claimant's thoracic and lumbar paravertebral region. (*Id.*) Claimant was assessed with thoracic disc herniation with myelopathy, low back pain, pain in limb, and left lumbar radiculopathy. (*Id.*) Claimant was advised to begin physical therapy for spine stabilization exercises and continue taking Naproxen, Soma, Percocet, Cymbalta, and Xanax. (*Id.*) Dr. Shramowiat informed Claimant that she could continue working at her job in packing and provided her a work release form indicating the same. (Tr. at 259, 261).

On September 7, 2011, Claimant told Dr. Shramowiat that she continued to work in her current job of packing, but she was experiencing severe difficulty performing any repetitive lifting, bending, or twisting. (Tr. at 253). Upon examination, Claimant had a positive left straight leg raise and pain with palpation to the left knee. (*Id.*) Claimant's bilateral lower extremity strength was 5/5, and her sensation was grossly intact. (*Id.*) Dr. Shramowiat advised Claimant to remain off work at that time and continue her medication regimen. (*Id.*) She was also instructed to begin physical therapy for spine stabilization exercises. (*Id.*)

Claimant presented to Jamy Fox, PT, for an initial physical therapy evaluation on

16

September 26, 2011. (Tr. at 250, 380-81). Claimant reported a work injury on July 12, 2011 resulting in immediate pain to her thoracic and lumbar spine. (Tr. at 380). Her complaints at the evaluation included increased pain with prolonged sitting, standing, bending, or lifting. (*Id.*) She also indicated experiencing numbness and tingling in her feet and hands in addition to neck pain. (*Id.*) Ms. Fox noted that active range of motion in Claimant's cervical spine was decreased fifty percent with respect to right and left rotation, and both flexion and extension were decreased by twenty-five percent. (*Id.*) Claimant's bilateral shoulder flexion and abduction was limited to 155 degrees with neck pain while range of motion in Claimant's elbows and wrists was within normal limits and pain free. (*Id.*) Ms. Fox recorded that Claimant's range of motion in her right knee and ankle was within normal limits and pain free, and Claimant's left knee range of motion was within normal limits with complaints of pain with left knee flexion and extension. (*Id.*) Ms. Fox also observed minimal crepitus in both knees with flexion and extension. (*Id.*) Claimant's upper extremity strength was 5-/5, and her right knee strength was 5/5 and pain free. (*Id.*) However, Claimant's left knee strength was 4+/5 with complaints of pain during resisted left knee movements. (*Id.*) Ms. Fox noted that Claimant walked with a minimal limp on the left and that Claimant reported left knee pain with ambulation. (Tr. at 381). Ms. Fox felt Claimant had good rehabilitation potential and recommended physical therapy three times per week for four weeks with instructions for a home exercise program. (*Id.*)

When Claimant returned to physical therapy on September 29, 2011, she reported thoracic back, neck, and right knee pain noting that she changed a tire on her car the day before, which made her feel sore. (Tr. at 252). Claimant again visited physical therapy twice in October 2011. (Tr. at 249). Her chief complaints on October 4 were neck, low

back, and left knee pain. (*Id.*) Claimant's therapist noted "extreme" loss of range of motion in Claimant's spine. (*Id.*) On October 5, Claimant's chief complaint was mid-scapular soreness and a pulling sensation from her mid-back cervical muscles. (*Id.*)

Claimant returned to Dr. Shramowiat on October 6, 2011 with complaints of mid and low back pain, shooting pain into both lower extremities, and numbness in her toes. (Tr. at 326). Dr. Shramowiat observed that Claimant's gait was antalgic on her left leg. (*Id.*) Dr. Shramowiat noted that Claimant's bilateral extremity strength was 5/5, her sensation was grossly intact to light touch, and her deep tendon reflexes at the patella and Achilles were 2+. (*Id.*) Claimant continued to exhibit severe pain with left knee extension. (*Id.*) Dr. Shramowiat advised Claimant to remain off of work for another month and continue her medication regimen of Naproxen, Soma, Percocet, Cymbalta, and Xanax. (*Id.*)

Claimant treated with Dr. Shramowiat twice more in 2011. On November 1, Dr. Shramowiat recorded a positive straight leg raise test on Claimant's left side and noted that Claimant's gait continued to be antalgic on the left. (Tr. at 377). Dr. Shramowiat's findings were otherwise identical to those at the October 6 visit. (*Id.*) With regard to treatment, Dr. Shramowiat administered a bilateral lumbar paravertebral trigger point injection and right trochanteric bursa injection. (*Id.*) On November 29, Claimant reported some improvement from the lumbar trigger point injection; however, she continued to complain of mid and low back pain with intermittent left leg pain and numbness in the fourth and fifth toe of her left foot. (Tr. at 376). Dr. Shramowiat's examination findings were similar to those at Claimant's prior appointment. (*Id.*) He opined that Claimant could not return to her former work and that she would need to perform a job search after completing physical therapy. (*Id.*) Dr. Shramowiat also indicated that Claimant would

only be able to perform sedentary work. (*Id.*)

Claimant presented to First Settlement Physical Therapy for an initial evaluation on December 5, 2011. (Tr. at 263-64). Upon examination, Claimant's bilateral knee extension was normal. (Tr. at 263). Claimant's right knee flexion was normal while her left knee flexion was fair. (*Id.*) Claimant's reflexes on a knee jerk test were 2+. (*Id.*) The physical therapist assessed Claimant with low back pain as well as decreased postural awareness, lumbar range of motion, and trunk strength. (Tr. at 264).

Claimant returned to First Settlement for physical therapy an additional seven times in 2011. (Tr. at 265-76). On December 6, Claimant complained of pain with extended periods of lying down and increased low back pain. (Tr. at 275). On December 8, Claimant had no new complaints. (Tr. at 274). She continued to have intermittent low back pain throughout the day. (*Id.*) Claimant's physical therapist noted that she was able to tolerate the therapy. (*Id.*) On December 12, Claimant reported numbness in her feet and low back pain, describing her pain as nine out of ten. (Tr. at 273). Claimant indicated that she had performed Christmas shopping and decorating the previous day. (*Id.*) On December 15, Claimant reported her back pain was less severe, and she exhibited improved tolerance to therapy. (Tr. at 271). On December 16, Claimant had no complaints regarding her treatment. (Tr. at 270). Claimant tolerated the therapy exercises and increased her duration on the treadmill. (*Id.*) At her December 19 visit, Claimant reported increased pain; however, her physical therapist observed that Claimant continued to progress and was able to tolerate an increase in exercise. (Tr. at 269). On December 21, Claimant continued to complain of increased low back pain and pain in both hips. (Tr. at 268). At that visit, Claimant's physical therapist completed a progress summary indicating that Claimant's prognosis was fair. (Tr. at 265). Although Claimant's tolerance

to housework had increased, she continued to have increased pain with housework and required frequent rest periods. (*Id.*) Claimant reported that she felt stronger. (*Id.*) The therapist noted that Claimant was able to complete eight minutes on the treadmill; however, the therapist opined that there was no change in her range of motion or strength. (*Id.*)

Claimant saw Dr. Shramowiat on January 24, 2012 for treatment under her workers' compensation case. (Tr. at 375). Claimant reported that she was not working at that time and was scheduled for a functional capacity evaluation the following day. (*Id.*) She indicated experiencing paresthesias in both hands. (*Id.*) Upon examination, Claimant exhibited thoracic and lumbar paravertebral tenderness along with paraspinal muscle tightness and tenderness in the mid to low back. (*Id.*) Claimant's lower extremity strength measured 5/5, and her patella and Achilles reflexes were 2+. (*Id.*) A straight leg raise test on the left elicited low back pain and the same test was negative on the right. (*Id.*) Dr. Shramowiat noted decreased sensation in the S1 distribution bilateral. (*Id.*) Claimant received a lumbar paravertebral trigger point injection. (*Id.*) At that time, Claimant's medications included Percocet, Naproxen, Soma, Cymbalta, and Xanax. (*Id.*) Dr. Shramowiat advised Claimant to stop taking Naproxen due to her hypertension, and he started Claimant on Lisinopril. (*Id.*)

Claimant treated with Dr. Shramowiat eight additional times in 2012. (Tr. at 370-74, 430-34). On February 21, Claimant remained off work with complaints of back pain that radiated into the low back and hips. (Tr. at 374). She also reported lower extremity weakness and cramps as well as paresthesias in both feet. (*Id.*) Dr. Shramowiat observed thoracic and lumbar paraspinal muscle tenderness and tightness. (*Id.*) Claimant's lower extremity strength was 5/5, and her reflexes were 2+. (*Id.*) A straight leg raise test was

weakly positive. (*Id.*) Dr. Shramowiat also noted that Claimant experienced some L5 paresthesias bilaterally. (*Id.*) Claimant returned on March 20 with complaints of neck, back, hip, and leg pain. (Tr. at 372-73). Dr. Shramowiat recorded that Claimant's upper and lower extremity strength was 5/5 and that sensation was grossly intact in all extremities. (*Id.*) Claimant was assessed with neck pain, bilateral shoulder impingement, greater occipital neuralgia, and osteoarthritis of the spine. (Tr. at 373). Dr. Shramowiat administered injections to Claimant's upper trapezius and left lumbar paravertebral trigger point. (Tr. at 372-73).

On April 12, Claimant complained of low back pain with shooting pain into her lower extremities. (Tr. at 371). Claimant reported that the prior lumbar paravertebral trigger point injection offered her some improvement. (*Id.*) Upon examination, Dr. Shramowiat observed that a straight leg raise test was positive on the left and negative on the right. (*Id.*) Dr. Shramowiat found that Claimant had numerous tender points and moderate to severe muscle tightness in the lumbar region. (*Id.*) Claimant's lower extremity strength and gross sensation were intact. (*Id.*) Dr. Shramowiat remarked that Claimant was not able to return to her former job given its lifting requirements. (*Id.*)

On May 15, Claimant again reported that she was experiencing moderate to severe low back pain. (Tr. at 370). Dr. Shramowiat's examination findings were nearly identical to those recorded at Claimant's April 12 visit. (*Id.*) Claimant's diagnosis was updated to include thoracic disc herniation with myelopathy and left lumbar radiculopathy. (*Id.*) On July 24, Claimant continued to complain of mid and low back pain with pain down both lower extremities. (Tr. at 434). Dr. Shramowiat's findings were largely the same as those indicated at Claimant's prior appointment, with the addition of painful lumbar range of motion. (*Id.*) Claimant was continued on Percocet, Xanax, Lisinopril, Cymbalta, and

Soma. (*Id.*) On August 9, Claimant exhibited moderate cervical, thoracic, and lumbar muscle tenderness. (Tr. at 433). Claimant's upper and lower extremity strength was 5/5, and her patella, Achilles, and brachioradialis reflexes were 2+. (*Id.*) However, Claimant experienced decreased sensation at the L5-S1 nerve root. (*Id.*) On October 9, Claimant reported back and right upper extremity pain along with tingling and numbness in both hands. (Tr. at 431). A physical examination revealed mild restriction in cervical range of motion, and full upper and lower extremity strength with grossly intact sensation. (*Id.*) A straight leg raise test was negative bilaterally. (*Id.*) Claimant was assessed with neck pain, cervical radiculopathy, mid and low back pain, lumbar radiculopathy, and sacrum pain. (*Id.*) On December 4, Claimant's complaints remained unchanged. (Tr. at 430). Dr. Shramowiat noted that Claimant recently underwent an x-ray of her sacroiliac joints, which was normal. (*Id.*) He also indicated that Claimant experienced some congenital hypoplasia of the coccyx. (*Id.*) Upon examination, Dr. Shramowiat noted that Claimant retained normal strength and sensation in her extremities. (*Id.*) A straight leg raise test was positive on the left. (*Id.*) Claimant was instructed to continue taking Soma, Cymbalta, Xanax, and Percocet; she was also provided prescriptions for Mobic and Tramadol. (*Id.*)

On February 27, 2013, Claimant treated with Dr. Shramowiat for her chronic neck pain and increased right arm pain. (Tr. at 429). Dr. Shramowiat noted that Claimant reported paresthesias in the C8 nerve root distribution as well as low back and left leg pain. (*Id.*) Claimant stated that she fell occasionally due to left leg paresthesias and weakness. (*Id.*) Upon examination, Claimant's extremity strength was 5/5, and her lower extremity sensation was intact. (*Id.*) A straight leg raise test was weakly positive on the left, and Dr. Shramowiat recorded that Claimant's left knee was mildly unstable with palpable tenderness. (*Id.*) Claimant's medication regimen was continued. (*Id.*)

Claimant next visited Dr. Shramowiat on April 24, 2013, and she reported that her symptoms had not changed. (Tr. at 427). Dr. Shramowiat noted impingement of Claimant's right rotator cuff and a positive Tinel's sign bilaterally. (*Id.*) Claimant's upper extremity strength was 5/5 with the exception of her right hand grip strength, which was 4/5. (*Id.*) Claimant's lower extremity strength was 5/5, and her patella and Achilles reflexes were +2; however, pain was elicited with left knee extension as well as varus and valgus stress testing. (*Id.*) Dr. Shramowiat also recorded that Claimant experienced paresthesias of the L5-S1 nerve root. (*Id.*)

At Claimant's June 24, 2013 appointment with Dr. Shramowiat, she described suffering from neck, right upper extremity, low back, bilateral leg, left shoulder, and bilateral knee pain. (Tr. at 447). She also indicated that she had been experiencing increased right arm weakness. (*Id.*) Upon examination, Dr. Shramowiat observed moderate cervical and lumbar paravertebral tenderness, moderate right trapezius muscle tightness, occipital nerve tenderness, right shoulder impingement, and tenderness and crepitus in both knees. (*Id.*) Claimant's extremity strength was 5/5, and her sensation in her extremities was intact, save for a slight decrease on the right median nerve root distribution. (*Id.*) Dr. Shramowiat recorded that Claimant had stopped taking Mobic and Tramadol, but she continued to take Percocet, Soma, Cymbalta, and Xanax. (*Id.*) He opined that Claimant required diagnostic studies, including an MRI of her neck and back. (*Id.*)

On August 19, 2013, Claimant again informed Dr. Shramowiat of neck pain that radiated down both shoulders and arms along with radiating low back pain and left knee pain. (Tr. at 446). Dr. Shramowiat observed that Claimant's extremity strength and sensation were intact. (*Id.*) He noted pain with left knee extension; however, Claimant

exhibited no knee instability or effusion. (*Id.*) Both of Claimant's knees demonstrated crepitus. (*Id.*) Claimant was assessed with cervical and lumbar radiculopathy, pain in limb, chronic left knee joint pain, and greater occipital neuralgia. (*Id.*) Her medication regimen was continued. (*Id.*)

Claimant next visited Dr. Shramowiat on October 15, 2013, when Claimant told him that she could not stand or sit for more than ten minutes and that she usually had to lie down to experience relief from her pain. (Tr. at 457). Dr. Shramowiat noted diffuse cervical and lumbar paravertebral tenderness along with moderate muscle tightness with trigger point tenderness and positive bilateral occipital nerve tenderness. (*Id.*) Claimant's upper extremity strength was 4/5 on the right and 5/5 on the left. (*Id.*) Dr. Shramowiat observed paresthesias of the fingertips in both hands. (*Id.*) Claimant's lower extremity strength measured 5/5. (*Id.*) With respect to Claimant's left knee, Dr. Shramowiat noted that the knee was catching or locking, and Claimant was unable to fully extend it. (*Id.*) In addition, Claimant had decreased sensation in the fourth and fifth toes of both feet. (*Id.*)

### B. Opinion Evidence

On January 7, 2012, Uma Reddy, M.D., completed a Physical Residual Functional Capacity Assessment regarding Claimant's functional limitations. (Tr. at 277-84). Dr. Reddy noted that Claimant's primary diagnosis was back and neck strain with degenerative disc disease, osteoarthritis, and carpal tunnel syndrome. (Tr. at 277). As to exertional limitations, Dr. Reddy found that Claimant could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, stand or walk about six hours in an eight-hour workday, and sit about six hours in an eight-hour workday. (Tr. at 278). Dr. Reddy also indicated that Claimant possessed an unlimited ability to push or pull. (*Id.*) With respect to postural limitations, Dr. Reddy determined that Claimant could

occasionally balance, stoop, kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes, or scaffolds. (Tr. at 279). As for manipulative limitations, Dr. Reddy opined that Claimant had unlimited ability to reach in all directions and feel; however, Claimant was limited in her ability to handle (gross manipulation) and finger (fine manipulation) due to her carpal tunnel syndrome. (Tr. at 280). Nevertheless, Dr. Reddy indicated that Claimant could perform light work despite her carpal tunnel syndrome. (*Id.*) Dr. Reddy concluded that Claimant had no visual or communicative limitations. (Tr. at 280-81). Regarding environmental limitations, Dr. Reddy determined that Claimant could have unlimited exposure to wetness, humidity, noise, fumes, odors, dusts, gases, and poor ventilation. (Tr. at 281). However, Dr. Reddy indicated that Claimant should avoid concentrated exposure to extreme cold, extreme heat, vibration, and hazards, such as machinery or heights. (*Id.*) In addressing Claimant's symptoms, Dr. Reddy noted that Claimant alleged back and neck strain, pain due to degenerative disc disease secondary to an injury, joint pains, arthritis, arthralgias, and carpal tunnel syndrome. (Tr. at 282). Dr. Reddy found that Claimant was partially credible and opined that physical activity restrictions were expected based on Claimant's symptoms. (*Id.*) Nevertheless, Dr. Reddy concluded that Claimant's activities of daily living evidenced she could perform work at the light exertional level. (*Id.*)

In the additional comments section of the Physical RFC Assessment form, Dr. Reddy noted that she reviewed MRIs of Claimant's lumbar spine, cervical spine, and left knee. (Tr. at 284). Dr. Reddy also summarized treatment notes from Dr. Shramowiat and Claimant's physical therapist, which indicated that Claimant experienced back pain, left knee pain, and loss of range of motion in her cervical, thoracic, and lumbar spine. (*Id.*) In addition, Dr. Reddy recognized that a July 2010 EMG showed that Claimant suffered from

bilateral carpal tunnel syndrome. (*Id.*) Finally, Dr. Reddy considered Claimant's October 2011 Adult Function Report, wherein Claimant stated that she could not sit, stand, or bend for more than twenty to thirty minutes and that she suffered from numbness and tingling in her hands that affected her grip. (*Id.*)

On April 19, 2012, Porfirio Pascasio, M.D., completed a Physical Residual Functional Capacity Assessment. (Tr. at 315-22). Dr. Pascasio indicated that Claimant's primary diagnosis was cervical and lumbar disc disease, and her secondary diagnosis was bilateral carpal tunnel syndrome. (Tr. at 315). Dr. Pascasio also noted that Claimant alleged that she had a ganglion cyst on her left knee. (*Id.*) Dr. Pascasio agreed with Dr. Reddy's conclusions as to Claimant's exertional, postural, manipulative, visual, and communicative limitations. (Tr. at 316-19). With respect to environmental limitations, Dr. Pascasio determined that Claimant could have unlimited exposure to extreme cold, extreme heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases, and poor ventilation. (Tr. at 319). However, Dr. Pascasio found that Claimant should avoid concentrated exposure to hazards, such as machinery and heights, due to her back and neck strain with degenerative disc disease and osteoarthritis. (*Id.*) Regarding Claimant's symptoms, Dr. Pascasio opined that Claimant was only partially credible. (Tr. at 320). Dr. Pascasio noted that Claimant reported she could only walk one hundred feet; however, Dr. Pascasio concluded Claimant's assertion was not supported by her medical records. (*Id.*) In the additional comments section of the form, Dr. Pascasio wrote that Claimant's activities of daily living were primarily limited by physical conditions. (Tr. at 322). He observed that Claimant was able to care for her twelve-year-old daughter and family pets, prepare meals, perform limited household chores, shop once or twice per month, and perform minimal driving. (*Id.*)

VI.    **Standard of Review**

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the record and determine whether it is adequate to support the conclusion of the Commissioner. *Hays*, 907 F.2d at 1456. When conducting this review, the Court does not re-weigh evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001) (citing *Hays*, 907 F.2d at 1456)). Moreover, "[t]he fact that the record as a whole might support an inconsistent conclusion is immaterial, for the language of § 205(g) ... requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" *Blalock*, 483 F.2d at 775 (citations omitted). Thus, the relevant question for the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig*, 76 F.3d at 589).

## VII.  <u>Discussion</u>

Claimant asserts that the ALJ's RFC finding failed to adequately account for limitations caused by her knee disorder and carpal tunnel syndrome. Social Security Ruling ("SSR") 96-8p provides guidance on how to properly assess a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1. RFC is a measurement of the **most** that a claimant can do despite his or her limitations and is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id.* According to the Ruling, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3. Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." *Id.* Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id.* at *4.

In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at

*7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at *7. With allegations of pain or mental distress, the RFC assessment must 1) "contain a thorough discussion and analysis of the objective medical and other evidence, including the individual's complaints of pain and other symptoms and the adjudicator's personal observations, if appropriate;" 2) "include a resolution of any inconsistencies in the evidence as a whole;" and 3) "set forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work." *Id.* Moreover, the ALJ must discuss "why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.* Similarly, the ALJ "must always consider and address medical source opinions" in assessing the claimant's RFC. *Id.* As with symptom allegations, "[i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *Id.*

Here, the ALJ found that Claimant was capable of performing light exertional work with some postural, manipulative, and environmental limitations. (Tr. at 15). Light work is defined as:

> [L]ifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking and standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b). The ability to stand and walk required by this exertional level is further clarified in SSR 83-10, which provides that light level jobs often require frequent walking and standing—"the primary difference between sedentary and most light jobs."

SSR 83-10, 1983 WL 31251, at *5 (S.S.A. 1983). According to SSR 83-10:

> "Frequent" means occurring from one-third to two-thirds of the time. Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time. The lifting requirement for the majority of light jobs can be accomplished with occasional, rather than frequent, stooping. Many unskilled light jobs are performed primarily in one location, with the ability to stand being more critical than the ability to walk. They require use of arms and hands to grasp and to hold and turn objects, and they generally do not require use of the fingers for fine activities to the extent required in much sedentary work.

*Id.* at *6.

Claimant argues that her knee ailment prevents her from completing the standing and walking requirements for a full range of light work. In assessing Claimant's alleged knee problems, the ALJ found at step two that the condition was not severe. (Tr. at 14). The ALJ noted that an October 2009 MRI of Claimant's left knee showed chronic multi-lobulated cystic masses in her superior popliteal region and superficial later knee that were believed to be ganglionic cysts. (*Id.*) The ALJ also recognized that the MRI evidenced mild medial femoral tibial compartment degenerative changes. (*Id.*) The ALJ acknowledged that the October 2009 MRI preceded Claimant's alleged disability onset date, and he remarked that "[t]reatment notes after the alleged onset date did not mention knee problems." (*Id.*) Given the "mild findings" from the MRI and Claimant's ability to continue working after October 2009, the ALJ concluded that Claimant's knee problems were non-severe. (*Id.*)

In the ALJ's RFC discussion, he summarized Claimant's testimony at the administrative hearing, including her claims that her knee problems interfered with her ability to work and that she suffered from a torn meniscus. (Tr. at 17-18). The ALJ also outlined Claimant's representative's opening statement at the hearing wherein the

representative stated that Claimant's treatment records contained notations of an antalgic gait and ambulation with a limp, which Claimant's representative attributed, in part, to Claimant's knee problems. (Tr. at 16). The ALJ specifically noted that Claimant's representative referenced the treatment records from Dr. Shramowiat concerning her knee impairment included in Exhibit 18F. (*Id.*) In addition, the ALJ mentioned Dr. Shramowiat's finding at a September 7, 2011 appointment that Claimant experienced pain with left knee palpation; however, Dr. Shramowiat recorded that Claimant's lower extremity strength and sensation were intact. (Tr. at 19). The ALJ went on to again summarize the results of Claimant's October 2009 MRI of her left knee and emphasized that there was no significant change between the findings of that MRI and those of an MRI taken in 2007. (Tr. at 18). The ALJ stressed that Claimant was able to continue working for approximately two years despite her reporting knee problems to her treating physician in 2009. (*Id.*) After establishing that Claimant had longstanding, chronic knee problems that had not significantly changed since 2007, the ALJ highlighted Dr. Reddy's and Dr. Pascasio's opinions that Claimant could perform light work with occasional postural activities. (Tr. at 21). The ALJ assigned great weight to these opinions as he found them to be consistent with the evidence of record. (*Id.*)

Although Claimant is correct that the ALJ erred when he asserted at step two that "[t]reatment notes after the alleged onset date did not mention knee problems," the undersigned finds that this error was harmless and that the ALJ's RFC finding with respect to Claimant's knee problems is supported by substantial evidence. To start, the ALJ corrected his step two error by explicitly considering Claimant's allegations of knee problems during the RFC discussion and by specifically citing to at least one treatment record describing knee pain created on or after Claimant's alleged onset date. In addition,

the ALJ was clearly aware of Dr. Shramowiat's subsequent treatment records regarding Claimant's knee problems given his references throughout the written decision to Exhibits 6F, 14F, 18F, and 20F, all of which contained records of Claimant's treatment with Dr. Shramowiat, including records prepared after the alleged onset date. (Tr. at 19-20).

Furthermore, this Court has repeatedly recognized that an "ALJ need not comment on every piece of evidence in the record." *See, e.g.*, *Cook v. Colvin*, No. 2:13-cv-30155, 2015 WL 430880, at *17 (S.D.W.Va. Jan. 30, 2015). While Claimant argues that this Court's past decision in *Meadows v. Colvin* supports her request for remand, the facts of that case are distinguishable from the facts here. No. 1:14-cv-15147, 2015 WL 3820609 (S.D.W.Va. June 18, 2015). In *Meadows*, the ALJ's RFC discussion minimized the seriousness of the claimant's cardiac disease and failed to acknowledge or discuss certain key evidence related to that condition, such as a treating physician's statements that the claimant suffered from disabling symptoms. *Id.* at *13-*16. Compounding the error, the ALJ's RFC finding relied on opinion evidence predating significant medical findings limiting the claimant's ability to walk or stand. *Id.* at *16. The Court ultimately concluded that the ALJ's error was not harmless because the ALJ failed to "to analyze and discuss medical evidence that potentially made a major difference in the RFC finding," and the Court could not determine whether the ALJ's decision was supported by substantial evidence. *Id.*

Here, in contrast, the undiscussed medical evidence related to Claimant's knee condition would not have made a difference in the RFC finding given the ALJ's reliance on medical opinion evidence taking that unmentioned evidence into account and given the lack of new or significant findings in the later records. The ALJ relied on the opinions

32

of Dr. Reddy and Dr. Pascasio in formulating Claimant's RFC, and both of those agency consultants found that Claimant could engage in light work even after reviewing the medical evidence of record, including the evidence related to Claimant's knee chronic condition. (*See* Tr. at 284, 322) (Dr. Reddy and Dr. Pascasio noting that they had received treatment records from Dr. Shramowiat dating back to March 2009). Unlike *Meadows*, the Claimant's medical records do not demonstrate any real change in her knee conditions after the agency consultants rendered their opinions. Indeed, Dr. Shramowiat's findings after the agency consultants formulated their opinions were quite similar to his findings before the consultants' opinions. To the extent that an individual record may suggest an exacerbation of knee symptoms after the agency consultants arrived at their opinions, the medical evidence taken as a whole is essentially equivocal; particularly, when one takes into account Claimant's failure to mention knee problems at all at four subsequent appointments with Dr. Shramowiat. (Tr. at 370, 430-31, 434); *compare* (Tr. at 429) (record from February 2013 noting mild instability of left knee with tenderness, but no effusion), *with* (Tr. at 446) (record from August 2013 noting crepitus in both knees, but no instability and no effusion). As such, the ALJ could appropriately rely on the opinions provided by Dr. Reddy and Dr. Pascasio in determining Claimant's RFC.

Moreover, the ALJ aptly pointed out that Claimant was able to work for two years at a **medium** exertional level position while suffering from this chronic knee condition. (Tr. at 18, 59). In fact, Claimant's treatment records demonstrate that she complained more consistently about her knee ailment in the two years preceding her alleged disability onset date than the two years following her alleged disability onset. For instance, there were seven appointments in 2012 at which Claimant did not complain of knee problems and Dr. Shramowiat did not record any abnormal examination findings related to

Claimant's knees. (Tr. at 370-72, 374, 430-31, 434). Furthermore, as summarized above in the medical evidence discussion, the clinical findings with respect to Claimant's knee problems during the time in which she was working are largely the same as those findings contained in medical records created after her alleged disability onset date.

Finally, the ALJ's RFC finding accounts for any limitation caused by Claimant's knee problems by restricting Claimant to occasionally kneeling, crouching, crawling, and climbing. (Tr. at 15). Insofar as Claimant contends that her knee problems cause additional limitations in standing or walking, the medical records do not bear that out. As the ALJ recognized, Claimant was able to persist in medium exertional level work for a substantial period of time despite her knee condition. *See* 20 C.F.R. § 404.1567(c) ("If someone can do medium work, we determine that he or she can also do sedentary and light work."). To the extent that Claimant cites Dr. Shramowiat's statement in a November 2011 treatment record that she could only perform a "sedentary job," there is no indication that Dr. Shramowiat's use of the word "sedentary" was meant to convey the same meaning of sedentary work as defined in the Regulations. *See* SSR 96-5p, 1996 WL 374183, at *5 ("From time-to-time, medical sources may provide opinions that an individual is limited to 'sedentary work,' 'sedentary activity,' ... or similar statements that appear to use the terms set out in our regulations and Rulings .... Adjudicators must not assume that a medical source using terms such as "sedentary" and "light" is aware of our definitions of these terms. The judgment regarding the extent to which an individual is able to perform exertional ranges of work goes beyond medical judgment regarding what an individual can still do and is a finding that may be dispositive of the issue of disability."). In addition, Dr. Shramowiat's opinion as to Claimant's RFC would not be entitled to any special weight. *Id.* at *2 (recognizing individual's RFC is finding reserved to the Commissioner).

Lastly, as the Commissioner notes, Dr. Shramowiat subsequently indicated in March 2012 that Claimant might be authorized for a trial return to her employment, and one month later, Dr. Shramowiat remarked that Claimant could not return to work solely due to the job's lifting requirements. (Tr. at 371-72).

In sum, the undersigned **FINDS** that the ALJ's RFC finding appropriately took into account Claimant's alleged knee impairment and that the ALJ's RFC finding is supported by substantial evidence in that respect. In particular, the ALJ's RFC finding is bolstered by the medical opinion evidence and the lack of any significant change in Claimant's knee symptoms after those opinions were rendered. Even assuming *arguendo* that the ALJ erred by not discussing additional evidence related to Claimant's knee impairment, any error was harmless given that the portion of the RFC finding related to Claimant's knee condition is supported by substantial evidence.

Next, Claimant avers that the ALJ neglected to sufficiently discuss medical findings related to her carpal tunnel syndrome and failed to adequately account for limitations in Claimant's ability to lift, carry, and handle caused by that condition. At step two, the ALJ found that Claimant's carpal tunnel syndrome was a severe impairment. (Tr. at 13). The ALJ recognized that an April 2009 EMG resulted in a diagnosis of bilateral carpal tunnel syndrome and that Dr. Shramowiat recorded a positive Tinel's sign bilaterally in April 2013. (*Id.*) In the RFC discussion, the ALJ summarized Claimant's testimony concerning her carpal tunnel syndrome. (Tr. at 17). The ALJ noted that Claimant described experiencing pain in her hands and arms as well as loss of grip in her right hand. (*Id.*) Claimant also stated that she suffered from numbness and tingling in her left hand; however, she retained the ability to carry twenty pounds and could lift a gallon of milk with both hands. (*Id.*) In addition, Claimant testified that she could use her upper

extremities for ten to fifteen minutes before she required a break. (Tr. at 18). With respect to the medical evidence, the ALJ acknowledged that an EMG was performed in 2010, prior to Claimant's alleged onset date. (Tr. at 19). The ALJ also noted that Claimant informed Dr. Shramowiat about "problems with both hands" in October 2010, but she continued to work ten-hour days and, in November 2010, Claimant declined surgery so that she could continue to work. (*Id.*) Additionally, the ALJ emphasized Dr. Shramowiat's consistent findings that Claimant's upper extremity strength was 5/5 and sensation was grossly intact. (*Id.*) However, the ALJ remarked that Claimant's right upper extremity strength was 4/5 in April 2013, and at that same appointment, a Tinel's sign test was positive bilaterally. (*Id.*) With respect to the medical opinion evidence, the ALJ acknowledged the conclusions of Dr. Reddy and Dr. Pascasio that Claimant would be limited in her ability to finger and handle objects due to her carpal tunnel syndrome. (Tr. at 21). The ALJ noted that Dr. Reddy opined Claimant would experience limitations "occasionally" in both of these areas. (Tr. at 21, 280). Consequently, the ALJ determined that Claimant could frequently (up to two-thirds of the workday) handle and finger. (Tr. at 21).

Claimant insists that the ALJ's RFC discussion is inadequate because it omits analysis of particular medical records supporting Claimant's allegations of hand numbness and paresthesias, and decreased upper extremity strength. However, as indicated above, the ALJ was not required to discuss each piece of evidence supporting Claimant's alleged symptoms. More importantly, the ALJ recognized and assessed these exact allegations in his summary of Claimant's testimony at the administrative hearing and her treatment records. (Tr. at 19). The ALJ accounted for Claimant's carpal tunnel syndrome by limiting her to frequent handling and fingering of objects. (Tr. at 15). The

ALJ appropriately underscored that Claimant was diagnosed with carpal tunnel syndrome and complained of paresthesias and numbness in both hands over two years before her alleged onset date, yet she continued to work demanding hours at a medium exertional level occupation and declined surgical intervention. (Tr. at 19). The medical records related to Claimant's carpal tunnel syndrome do not reveal that the condition significantly worsened after Claimant's alleged onset date, and as such, Claimant's ability to work for over two years with her carpal tunnel symptoms belies her argument that the ALJ was required to include additional limitations with respect to lifting, carrying, or handling in the RFC finding.

Furthermore, the ALJ properly relied on Dr. Reddy's opinion that Claimant could frequently engage in activities requiring gross and fine manipulation. (Tr. at 21). Dr. Reddy formulated her opinion after reviewing the medical evidence related to Claimant's carpal tunnel syndrome, including several reports of bilateral paresthesias, and while she acknowledged that Claimant would experience manipulative limitations due to the condition, she still determined that Claimant possessed the ability to frequently handle and finger objects. (Tr. at 280, 284). Medical records post-dating Dr. Reddy's opinion do not demonstrate that Claimant's carpal tunnel syndrome significantly worsened. Consequently, the ALJ did not err in adopting the agency consultant's opinion on that point. As the ALJ emphasized, Dr. Shramowiat consistently recorded that Claimant's upper extremity strength was 5/5 and that her upper extremity sensation was grossly intact. (Tr. at 19). Indeed, Dr. Shramowiat found normal upper extremity strength and sensation at appointments in March 2012, August 2012, October 2012, December 2012, and August 2013. (Tr. at 373, 430-31, 433, 446). Moreover, Claimant did not report any complaints with respect to her upper extremities at appointments in April 2012, May

37

2012, and July 2012. (Tr. at 370-71, 434). Although there were clinical findings of decreased upper extremity strength in April 2013 and October 2013, which the ALJ acknowledged, the majority of the clinical findings from Dr. Shramowiat's treatment records indicate that Claimant's upper extremity strength was normal.[2] (Tr. at 19, 427, 457). Similarly, several treatment records demonstrate that Claimant's upper extremity sensation was primarily intact, despite complaints of bilateral hand numbness or paresthesias.

Ultimately, the undersigned **FINDS** that substantial evidence supports the ALJ's RFC finding with respect to Claimant's carpal tunnel syndrome. Specifically, the ALJ's finding is supported by the medical opinion evidence and Dr. Shramowiat's consistent findings that Claimant's upper extremity strength and sensation were normal. While Claimant can point to medical evidence supporting her position, and she may disagree with how the ALJ weighed the medical evidence, the Court must not re-weigh the evidence or substitute its judgment for that of the Commissioner. *Craig*, 76 F.3d at 589. Here, substantial evidence supports the ALJ's RFC finding, and that is the proper extent of the Court's inquiry.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the District Court confirm and accept the findings herein and **RECOMMENDS** that the District Court **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 10), **GRANT** Defendant's request for judgment on the pleadings,

---

[2] In addition, at least two medical records prior to Dr. Reddy's and Dr. Pascasio's RFC Assessments stated that Claimant's upper right extremity strength was decreased. (Tr. at 345, 380). As such, their opinions as to Claimant's functional limitations would have taken any intermittent upper extremity weakness into account.

(ECF No. 11), and **DISMISS** this action, with prejudice, from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Copenhaver, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** March 17, 2016

Cheryl A. Eifert
United States Magistrate Judge